BLAISDELL v. LONG ISLAND R. CO.

(Supreme Court, Trial Term, Nassau County. February, 1911.)

CARRIERS (§ 304*)—ASSAULT ON LICENSEE—LIABILITY.

Where a railroad company did not take such measures as a reasonably prudent man would have taken to prevent one known to be insane and quarrelsome from coming into its station, it is liable for an assault made by the insane person upon one waiting in the station to meet an incoming passenger.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1113; Dec. Dig. § 304.*]

Action by William Blaisdell against the Long Island Railroad Company. On motion to set aside the verdict and grant a new trial. Motion denied.

Blandy, Mooney & Shipman (Charles Blandy, Franklin A. Coles, and L. A. Sullivan, of counsel), for plaintiff.

Joseph F. Keany (John J. Graham, of counsel), for defendant.

SCUDDER, J. On April 13, 1909, the plaintiff, while in the waiting room of defendant's station at Port Washington, awaiting the arrival of his wife by a train due at the station shortly before midnight, was assaulted by a man of unsound mind named Michael Fallon. Defendant is sued for the injuries received by plaintiff as the result of this assault. The trial court reserved its decision of defendant's motion to dismiss the complaint, made at the close of plaintiff's case. The defendant introduced no evidence, and the case was submitted to the jury, who returned a verdict of $8,000 in favor of the plaintiff.

In determining defendant's motion for dismissal of complaint, the evidence is to be viewed in the light which is the most favorable to plaintiff. When thus viewed, there is evidence to support the following conclusions:

1. Fallon was of unsound mind, and his mental condition was apparent to any man of average intelligence, who had an opportunity to observe his appearance, general demeanor, and speech. Not only is such conclusion justified by the testimony of a large number of witnesses, who were acquainted with Fallon and his general reputation, but it is also supported by the testimony and demeanor of Fallon himself, when upon the witness stand.

2. Defendant's employés in charge of the station, namely, Gorman and Huppe, notwithstanding Fallon's apparent unsound mental condition, not only permitted, but encouraged and invited, Fallon to frequent the station for more than a year before Fallon's attack on plaintiff.

3. After the fight between Huppe and Fallon in the waiting room of the station, a week or more before Fallon's attack on plaintiff, defendant's said employés knew then that Fallon was so insane that his presence in the station was dangerous. Huppe testifies that on that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

occasion "he [Fallon] was very unruly and incoherent in his speech, making several remarks that were surly and not proper for a man hanging around the station," that in the course of the fight Fallon bit him, and that he only succeeded in putting Fallon out of the station after getting himself "pretty well banged up." It also appears that Huppe's superior, Gorman, was immediately informed of Fallon's conduct on this occasion.

4. Notwithstanding that, after the fight between Huppe and Fallon, defendant's said employés knew that Fallon was dangerously insane, they did not forbid him to come to the station, or take any measures to prevent his coming, but, on the contrary they continued to encourage and invite him to come there. A week elapsed between the time of Fallon's first outbreak in defendant's station and his second outbreak therein, when he attacked and injured the plaintiff. Defendant's employés had ample opportunity to procure police protection, which would have prevented the second occurrence. They neglected to seek such protection. The fact that neither Huppe nor Gorman procured Fallon's arrest after he had committed a most serious breach of the peace in the station justified the inference that they condoned his misconduct. This inference is supported by other evidence.

Fallon's testimony that after the fight he came frequently to the station, and that he received telegrams for delivery from defendant's employés, is uncontradicted. It appears from Huppe's testimony that on the very day on which Fallon attacked and injured the plaintiff, and only a few hours before such attack was made, Huppe permitted Fallon without objection, not only to enter the waiting room of the station, but to come into the ticket office and to take something therefrom. Not only do the acts and conduct of Gorman and Huppe contradict their testimony that after the fight they each respectively forbade Fallon to come to the station, but the testimony of each is also discredited by conflict with that of the other. Huppe testified that he informed Gorman of his altercation with Fallon by a letter. Gorman testifies that he was present when it occurred. Huppe testifies that he did not hear Gorman order Fallon not to come to the station. Gorman testifies that Huppe was near by when he gave such order to Fallon. Under these circumstances Fallon's testimony that after the fight he was not forbidden to come to the station may be accepted as the truth.

5. Huppe's acts and conduct provoked the insane violence under which Fallon was laboring when he attacked plaintiff. The circulating of the story by Huppe that Fallon had bitten him, and Huppe himself reluctantly admits that he did so, indicates a personal animosity against Fallon, and an intention to provoke further hostilities with him. Huppe's animosity and intentions bore fruit. Fallon came to the station, just after hearing that Huppe had said that he had bitten him, and found Huppe a willing and expectant adversary. On Fallon's asking Huppe, "Did you say I bit you?" Huppe promptly responds that he did, and raised the poker, which he happened to have in his hand, in a threatening manner. Fallon was thrown into the furor or mania in which he attacked and injured the plaintiff.

It would seem that there is some evidence to support the above conclusions, and that they constitute the essential elements of a cause of action by the plaintiff against the defendant. After Fallon's first outbreak in the station, defendant was charged with the knowledge that his presence endangered others who might be in the station, and from the fact that Fallon continued to frequent the station after that outbreak it could be reasonably anticipated, and defendant therefore was bound to anticipate that Fallon would continue to come to the station unless prevented. Under these circumstances defendant's duty of care for the safety of the traveling public and those whom it invited to use its station required it to take such measures as reasonably prudent men would take to prevent Fallon from coming to its station. Defendant wholly failed to perform this duty. If it had done so, the second outbreak of Fallon in its station would not have occurred, and plaintiff would not have been injured by him.

Motion to dismiss complaint denied. Motion to set aside the verdict also denied.

---

(73 Misc. Rep. 352.)